Mr. Wells? Mr. Chief Justice, and may it please the Court, Congress has unmistakably ordained that one set of rules govern animal handling and treatment, inspection, and determinations of meat quality for sale at federally inspected slaughterhouses from California to Maine. And those rules kick in at the slaughterhouse gate, and they continue to be in effect through the sale of the meat by the slaughterhouse. California has enacted its own set of rules regarding nonambulatory animals, rules which were intended to be and are different than and in addition to the Federal rules regarding the handling of nonambulatory animals. Where Federal law sets requirements for receipt and allows for receipt if those rules are followed, California law bans receipt of the animals altogether. Scalia, what about purchase? What about the contract to purchase? The California law addresses that. Do you contend that that is preempted as well? We do, Your Honor. And so? Justice Scalia, the reason that we do is because to the extent that purchase is even relevant with respect to a federally inspected slaughterhouse, I think all the What if it weren't? What if it took place at an auction site apart from the slaughterhouse? Well, Justice Kagan, because the scope of the FMIA starts at the gate of the slaughterhouse and ends with sale, California, I think, could regulate and not have its regulation be expressly preempted if it attempted to prevent purchase before the purchase occurred. Or contract to purchase. I mean, if the contract to purchase is made apart from the slaughterhouse itself, they could make it unlawful for the person who raises the animals to sell them when they're nonambulatory and unlawful for the slaughterhouse to contract to buy them, right, so long as the contract is off the premises? So long as the contract — so long as title didn't pass, Your Honor, or the — it didn't interfere with what happens on the premises, from the gate through sale, then I believe that would not be expressly preempted by Federal law. There could be implied preemption issues, however, in that circumstance. Sotomayor So your position is if the contract for purchase is consummated in some way on premises, that's preempted? And so your answer to Justice Kagan and Justice Scalia is that if the purchase contract occurs before the animals arrive at the gate of the slaughterhouse, that that would not be preempted? Not be expressly preempted. Again, there may be implied preemption issues. But if the law — I think, Your Honor, if the law is intended to target a— Sotomayor Well, your whole argument is on express preemption. Yes, Your Honor, absolutely. Sotomayor Have you given up any argument on implied? Before — we've not raised that argument before this Court, that's correct. Please tell me why you think the sale of the meat is expressly preempted. Your Solicitor General says it's a closer question on sale of the meat, because the slaughterhouse processes, the law is involved only with the operations and of the premises and manner of slaughtering, and has nothing to do with sale. So why is the sale of the meat preempted? Your Honor, sale is a — it is a practical step. And the word operations, as used in 678, I think all the parties agree, it encompasses all the practical steps of the slaughterhouse. Sale clearly is the last practical step to which all other practical steps are directed. So it is an operational step. It would be news to the slaughterhouses that sales is not a part of their operations. Sotomayor So how about there's a law that says you can't slaughter cats, dogs, or horses, or you can't sell cats, horse, dogs, or horses for slaughter or for consumption? Is that preempted? It would be. Well, with respect to cats and dogs, the answer would be no, because those are not amenable species that are subject to inspection at a Federally inspected slaughterhouse. So that's outside the scope of the statute. Sotomayor It's a Federal regulation to that effect? No. Yes. Only amenable species can be slaughtered. Amenable species are defined at USC, 21 USC section 601, subsection W. And cats and dogs are not amenable species. So. And what's that definition? Well, the definition is a — it's kind of a roundabout definition, Your Honor. Amenable species is — mentions — I mean, frankly, it mentions catfish and another species, and then all of the animals which were amenable species prior to the amendment of the Act in 2005. We set that forth in footnote 11 of our brief, but it clearly includes swine and it includes — it includes horses. It includes cattle, obviously. So the Seventh Circuit and I forget what the other circuit was, were incorrect in saying that the State could prohibit the slaughter of horses? Yes, Your Honor. I believe they were incorrect, although I would say that even under the rationale that the Fifth and Seventh Circuits used, their rationale would not save this State law. And the reason that it wouldn't is, even if you were to decide that those statutes — those cases were decided correctly, the rationale that the Court used was we can interpret those States' laws in a way that the laws never have to affect the operations of the slaughterhouse, because we can interpret those laws to keep the animals off the slaughterhouse — off premises. It's easy to identify what's a horse and keep it off the premises. That's not true with nonambulatory animals. Nonambulatory animals present with the symptom of nonambulatory nests on the premises or on the trucks that are waiting to arrive on the premises. So there is no way that this State law could be interpreted in a way not to operate on the premises. Alitozzi, but doesn't it seem strange to hold that the Federal Meat Inspection Act speaks to an issue like that? This doesn't have anything whether or not horses should be slaughtered and sold and their meat should be sold. It doesn't have anything to do with food safety, does it? And it doesn't have anything to do with humane treatment, assuming the same methods  Well, I would disagree, Your Honor. It clearly has to do — this issue clearly has to do with both of those issues. As the State has admitted on page 6 of its brief, this law was intended to address both humane handling of animals, which is covered directly in section 603B of the Federal law. No, I wasn't speaking of the California law. I was speaking of a law that prohibits the slaughter of horses. That's based just on a judgment, a societal judgment that this is an animal that should not be slaughtered and sold for food. What does that have to do with any of the purposes of the Federal Meat Inspection Act? Well, because Congress has made a different — a different judgment, Justice Alito. And what Congress has said is we've identified, we, Congress, have made a moral judgment that the following species are amenable and may be inspected on slaughterhouse premises. And to the extent that the State is making a different moral judgment — And that, presumably, is why Congress excluded cats and dogs. That Congress — Lassie and kitty are no good. Congress made a moral judgment that the Federal law — But Dobbin is all right. I believe that's right, Your Honor. It is a moral judgment by Congress as to which animals are going to be amenable for slaughter and which ones aren't. Mr. Young, you suggested that even if the Seventh Circuit was correct, there would still be a difference because of ease of identification. You can tell a horse is a horse and keep the horse away from the slaughterhouse. Would it be possible to say the same thing about nonambulatory swine? And I guess my question is, do nonambulatory swine usually become nonambulatory in transit or at the slaughterhouse, or could you identify such swine earlier? Nonambulatory swine become nonambulatory — may become nonambulatory in transit. They may become nonambulatory on the slaughterhouse premises. The only way that the slaughterhouse operator knows that an animal that has been transported has become nonambulatory, however, is when the truck is brought onto the premises, the gates are thrown open, and the animals are shepherded off, and one of them doesn't move. Isn't that the case? But I guess the State could make it unlawful for a rancher or what are the people that ship the animals, do you call it? Could be a rancher or a farm. A rancher or a farmer could make it unlawful for them to ship a nonambulatory swine, could they not? Well, Your Honor, Congress actually has enacted regulations that don't — they don't apply to slaughterhouses because, again, the scope with respect to slaughterhouses started at slaughterhouses. Yes, but as far as this statute is concerned, it would not preclude a State law that forbids a rancher to ship a nonambulatory swine, right? That's correct. There are Federal — I should point out, there are Federal regulations that govern the transportation of dead, dying, and diseased animals. They don't apply to slaughterhouses. They may apply in the situation that Your Honor is presenting. But it's not the case that the argument on sales would apply at the front end as well. You say sales can't be regulated because it's really just a way to get to the regulation of what goes on at the slaughterhouse. Wouldn't that concern also apply at the front end? Well, Your Honor, our argument about sales is slightly different, and it's a little different than the argument that's being made by the government. Our argument with respect to sale is there are requirements specifically regulating sale. That's found in 21 U.S.C. section 610C. That says, essentially, meat may not be sold if it is adulterated, or to put it another way, you may sell the meat if it's unadulterated. So that's a requirement. It's within the scope of the FMIA. It goes directly to sales as an operation. And it is different than and in addition to the State regulation, because what the State adds, the State adds another condition. They say you may not sell the meat if it is from a nonambulatory animal, or looked at the other way, you may sell the meat as long as it's not from a nonambulatory animal. Isn't that logically not doesn't that logically not follow? You may not sell meat if it's been adulterated. It doesn't mean that you can sell meat so long as it's not been adulterated, right? Well, no, I think there was a limitation, not a grant. Well, I think, though, that there were – I think that what the Federal government has done is established a requirement for the sale of meat. California has established another requirement for the sale of meat. Under Federal law, one requirement for the sale of meat is that it not be adulterated, that it pass through inspection, that it be stamped USDA-approved. All the conditions that happen at a slaughterhouse. The State, though, has set forth a different condition, and that is you may not sell that meat unless it comes from a nonambulatory animal. Alito, isn't it the case that most nonambulatory animals become nonambulatory because of the method of transportation that's used? Do you dispute the statistics in the brief of the non-State Respondent that Respondents that nationwide approximately 220,000 swine die during transport, another 440,000 become nonambulatory during the transportation process? Your Honor, the shorter answer is I don't know where those statistics come from, and to my knowledge, they are not accurate, but I don't have additional statistics to repeat. Do you dispute the fact that the reason that ranchers generally do not ship animals that are nonambulatory at the time when the trip begins, but that most of these nonambulatory animals become nonambulatory during the transportation process? I think that is a fair assumption, Your Honor, with respect to pigs that present being nonambulatory when the doors to the truck are opened. I think that that's correct. I think that the practice is not to ship nonambulatory animals if you know beforehand that they're not. And you think it's difficult to identify which animals are nonambulatory? That's the difference between horses, between prohibiting the slaughter of horses because you can tell whether it's a horse or a pig, but you can't tell whether a pig can walk? No, it isn't the only difference, Your Honor. Really, what I'm really saying is the condition of being nonambulatory presents on slaughterhouse premises, and so there is no way for a law to – no way for us to say that California law can be interpreted in a way that will not tell a Federal slaughterhouse what to do and how to do it with respect to nonambulatory animals. That's not true in the horse case. In the horse case, you can say keep the horses out. The Federal slaughterhouse doesn't have to have anything to do with horses. So if I could just say that. Would it be possible – if it's okay for California to say you can't sell a nonambulatory animal, and that that applies to everyone off the slaughterhouse premises, is that – that's basically your position, so that if the purchase occurs on premises, then the person who's selling it, even if it's not the slaughterhouse, can still sell it on the premises? If the – if I understand your question, Your Honor, if the – if the – let's say, just for the shorthand, if title passes on the premises, if that's how it's understood in the industry and that's what it is, that would be preempted. But if the law took effect – Sotomayor, what a fascinating area of immunity. Now what we're saying to auction houses and everyone else is don't pass title until you get to the slaughterhouse. Well, Your Honor, it's just – I mean, I think the real question is what has the Federal Government said about nonambulatory animals in general, and are those amenable species, and may they be – may they be slaughtered and turned into food? And the Federal regulations deal directly with that situation. So whether title passes before or after, if the animal is on the Federal premises, there are a whole series of Federal regulations that tell the slaughterhouse worker exactly what the worker is supposed to do with that animal. Kagan. Kagan. Does that mean that a State could actually pass a law and create a facility, let's say, that says – the law says the trucks have to stop at the State facility before it gets to the slaughterhouse, and at the State facility we'll check to see whether there are nonambulatory animals and make sure that those animals don't go on to the slaughterhouse. Would a State be within its rights to do that? Your Honor, the language of section 603a says that the inspection is to occur before they enter the slaughterhouse. Now, that has been interpreted by the Secretary to essentially mean immediately before, so – so trucks in line. So I think, under Your Honor's hypothetical, if the State had set up their own inspection program right immediately outside of a – of a Federally inspected slaughterhouse, that currently would be within the scope of the FMIA, because that's how the Secretary has defined it. The further upstream it goes, though, the less likely it is to be expressly preempted. Alito, if they do it at the weigh station and the truck has to stop at when it enters the State, that would be okay? That would not be expressly preempted, Your Honor. There might be implied preemption issues. And if there are no further questions, I'd like to reserve my remission. Thank you, counsel. Mr. Horwich. Mr. Chief Justice, and may it please the Court, I haven't heard any quarrel this morning with the proposition that if an animal goes down, say, as it's entering the abattoir to be slaughtered, that the State cannot at that point tell the slaughterhouse how it is to handle that animal. But that is not any different, of course, than the situation where a pig goes down as it's coming off the truck or it presents as nonambulatory when the gates of the truck are open, because it's still an operational consideration. The same humane handling requirements still apply. It's still a State requirement and it's not – it's still different from the Federal requirements. So the Court's questions this morning I think have gone to kind of the situations at the margins, at the extremes. So let me try to address some of those questions. The question about whether – the question about the purchase of the nonambulatory animal and the regulation there, the first thing is, as a practical matter, I think you have to think about it in a concrete situation, which is that there is a nonambulatory animal that's on the slaughterhouse premises. That's the hypothetical that we're in. And the question is, what is the slaughterhouse employee to do with that animal? And the State law says, well, you can't buy it, you can't hold it, you can't receive it, you can't turn it into meat and you have to immediately euthanize it. Alitoso, before you get to that point, the animal has to be transported. Does Federal law regulate for humane purposes the transportation of animals to slaughterhouses? There are Federal laws regarding transportation. The Federal Meat Inspection Act has not been interpreted by the Secretary to apply specifically to trucks that are in transit. Although I should say that the Secretary has, for example, interpreted the FMIA, and this is in Part 309.1b, to apply, at least to the extent of humane handling, to pens at stockyards that are committed exclusively to a slaughterhouse. And I think if there were a situation such as, I think, Justice Kagan, your hypothetical envisioned, where a State determined that it wanted to essentially assert an inspection jurisdiction over animals that were in transit to a slaughterhouse, so essentially between the pen and the slaughterhouse, the Secretary might well recognize that it needs to extend to those, because the purpose of the Act, after all, is to set a Federal inspection standard for animals to determine if they are suitable to be turned into meat. And if the Federal — if Congress has not chosen to regulate the transportation of animals to prevent inhumane treatment in transit, why should a State law that aims at that objective be preempted? Well, if you disagree with me about the scope of the FMIA in that regard, the State law with respect to the handling of the animals while they are in transit wouldn't be preempted. But, of course, the injunction that I understand Petitioners to be seeking is not one that goes to State regulation of trucks, but rather to State regulation of animals that are on the slaughterhouse premises. And the Secretary has made unmistakably clear that the scope of the FMIA is at least as large as the official slaughter establishment's premises. Alitoso, if the State could inspect the trucks at a waste station before they get to the slaughterhouse, why can't they do the same thing when they get to the slaughterhouse, where it's more practical to do that? Well, accepting the premise of your hypothetical that the State could do the inspection on the truck. But do you dispute that? I dispute that, but I'll accept that premise. Even if I accept that premise, the question here is different because the Secretary has drawn a line that says the scope of the FMIA, and that's — the question is the scope of Federal law here. That's in section 678. The Secretary has made very clear that the scope of the FMIA extends to all animals that are on the premises of the establishment. That's what the appendix is. Ginsburg. So is there anything saved to the State? I mean, there is a savings clause. Once you get to the entrance to the slaughterhouse, is there any room for any State regulation? Absolutely, Justice Ginsburg. I mean, State laws of general applicability would, to the extent they don't in some particular application intrude into the scope of the FMIA, they would apply. And I also want to be very clear, so that there's no mistaking the government's position, State prosecutions for animal cruelty are not preempted to the extent they are prosecuting conduct that is unlawful under Federal law, because that is — that is an example of a State that is not applying a different or an additional standard of conduct, but simply adding — applying its own sanction for conduct that Federal law would similarly sanction. So there's absolutely room for State — the application of State law on the premises of the slaughterhouse. Kennedy, in that respect, do State inspectors routinely go on the premises of slaughterhouse to ensure that their coextensive laws are properly enforced? And if that's so, are there problems of judgment, the Federal inspector says, no, this is okay under Federal law, and the State official says, no, this is not okay under the State law, even though they say the same thing? I'm — I am not aware that, in general, State inspectors or other State officials would go to a Federally inspected premises as a general matter. But let's assume for the sake of argument that they were, and then your question presents the question about these sort of differences in judgment that might be made. The Federal regulations generally provide that the disposition made by veterinarians — by Federal veterinarians is the conclusive judgment of the Secretary as to the fitness of the animal for turning into meat. And so in that situation, the State official would not be able to reach a different judgment on that question. And so I — so I think that would resolve any situation where State officials were there. Of course, the situation where State officials do inspections is the one that the Act itself envisions and that California has not taken the opportunity to implement, which is for intrastate-only plants, States can enact their own inspection regulations and have their own inspectors there as long as they're following Federal standards at a minimum. Breyer. What am I supposed to do? A quick procedural question, which I think was similar to Justice Ginsburg's. Suppose this is three sections of the State law and some of them have three parts. Suppose I thought, well, the word by, I mean by might cover an awful lot of things that don't have much to do with operations. Maybe sometimes they do. Suppose I ended up thinking that, but I thought you were right about all the rest of it. What am I supposed to do? Well, I would like to have an opportunity to take issue with your premise, but the answer to your question is this case comes here on preliminary injunction, so I think the Court could appropriately articulate its answer and its understanding of the different provisions, and that probably would then lead to the lower courts working out the particulars of the injunction. But let me actually make a point in that regard about what the injunction might or might not look like with respect to the buying provision, which is that I don't understand the State to have some free-floating interest in when title does or doesn't pass. The State is interested in regulating what animals can be purchased because of a background principle of State law that I assume exists, that slaughterhouses can't slaughter things they don't own. And if you put those two pieces together, the ban on buying is nothing but doing in two steps what the State clearly can't do in one step, which is tell slaughterhouses how they are to deal with an animal that is on their premises. At least the States can't tell slaughterhouses how to do that when there is a Federal regulation on it. Scalia Do we have to peel this onion in order to decide this case? I mean, do we have to go through each little provision of the statute and say this is in, this is out, this is in, this is out? Can't we just either affirm or reverse the particular preliminary injunction that was answered or that was issued here? I think the Court could do that, although I think there is some concern that if the Court were to find, to have some concern with some specific aspect of the injunction and I guess I would let Petitioner's counsel speak to this, there would be some concern that vacating the injunction so that it could be corrected would leave the Petitioner in a spot where it wouldn't have protection from the vast majority of provisions. Breyer What I discover is there are at least 11 different provisions in this. I have exactly Justice Scalia's question. Do we have to write 11-part opinion where we treat each of these different things, which are different, separately and analyze it? I'm not trying to get out of the work. I just want to know.  The right way to get out of the work would be to understand that California has made every effort here to implement a provision that, to implement one underlying requirement, which is that it wants to tell slaughterhouses, don't turn these animals into food, immediately euthanize them instead. And the rest of these are just ways of implementing that underlying requirement. And this answers your question. Breyer Suppose we agree with you about that. We say, if I agree with you about that, there we are, you're supposed to pick up this slaughterhouse floor and kill it right away. That seems to have to do with operations. All the rest of these other ten provisions are just variations on that theme, according to the government, and we send it back for them to argue this out below. If there would be anything left to argue out below at that point, I would say that it's not. Roberts Well, there are the ten parts, but I actually want to answer, well, I want to give a one-sentence answer. I think I can. Justice Sotomayor's question, which is the question about the sale of the meat, which, again, I think fits under the rubric that it's just implementing the underlying prohibition that California seeks here. Thank you. Roberts Thank you, counsel. Ms. Smith. Smith Mr. Chief Justice, and may it please the Court, in order to be preempted here, the State provisions have to be a required – excuse me, the State law provisions have to be within the scope of the Act and with respect to the premises, facilities, and operations. None of the State provisions are within the scope, and some are not even operations. The scope are the mandates of Federal law dealing with the method, quality, and marketing of turning animals into meat for human consumption. Sotomayor All right. So now explain how, under your definition, it's not among at least one of those. Smith None of the provisions are within the scope because California is not regulating animals that are going to be turned into meat. And the Federal Meat Inspection Act, the purpose of the Act, the legislative history of the Act, show that the scope of the Act is concerned with animals that are going to become meat. Kagan Well, is that true, Ms. Smith? I thought that under the Federal program, some of these animals could become meat. Under the Federal program, you take a nonambulatory animal and you say, well, some of them might be condemned, but some of them are suspect. And if they're only suspect, it may be that eventually they'll be turned into meat. Smith That is correct. But the entire purpose of the Act is to inspect and examine animals to determine whether or not their meat will be wholesome and unadulterated. Scalia No. No. Provisions of the Act, at least as amended, also require humane treatment of the animals while they're being processed. That has nothing to do with whether the meat is any good. It has to do with humane treatment of the animals. Smith The humane treatment of the animals deals with animals in the connection of slaughter or while being slaughtered. And the animals that California is regulating, the nonambulatory animals that we're withdrawing from the process, will not be slaughtered, will not be turned into meat. Even the the Federal requirements of humane treatment do not apply once the slaughterhouse decides that this animal will not be slaughtered for meat. Then the slaughterhouse can do whatever it wants with a poor animal. I can't be right. Well, the language of the regulations, of the Federal regulations dealing with U.S. condemned animals, for instance, say that U.S. condemned animals shall be killed and shall not be slaughtered and dressed in the same facility with animals that will be turned into meat. So even in the regulations, there's a distinction between animals that will be slaughtered for meat and that will be edible and ones that are, are, are sharp, sharp instruments that can injure them. Does that apply to only those that are going to be sold for meat? It applies to, well, specifically, the provisions in the Federal Meat Inspection Act apply to the animals that are going to be turned into meat. To the extent they apply to other animals or all animals, as has been referenced, they would be pursuant, those provisions would be pursuant to the Humane Methods of Slaughter Act, which is, does not have a preemption clause and does not include slaughter. No, but that, that act amends, amends the act that does have a preemption clause. Correct. And therefore, it seems to me, the preemption clause applies to the humane provisions as well. It applies to the humane provisions with animal, with respect to the animals in connection with slaughter and that will be slaughtered with respect to the Federal Meat Inspection Act, because the Humane Methods of Slaughter Act, it was not incorporated into the Federal Meat Inspection Act. It does not have an express preemption clause. And there's no language in the text of that act, the Humane Methods Act, or in legislative history showing that it was an attempt to federalize animal cruelty law, for instance. So, so the idea that the act is incorporated in that act, it only applies to humane treatment by slaughterhouses, right? Correct. Act 603 and 610 of the Federal Meat Inspection Act reference the Humane Methods Act and reference that that is to be applied when the animals are in the, being processed in the connection with slaughter and being slaughtered. So, again, it is, it is limited to the animals that, that are going to become meat under the Federal Meat Inspection Act. But they don't, you don't know whether they're going to become meat until after the And your rules seem to prohibit that. Our rules, well, the antemortem inspection and postmortem inspection are required of animals that are going to be turned into meat, correct. And our, the California law does not touch on postmortem inspection at all. And only in the case, excuse me, and the, as far as the But I mean, your, your argument up to this point has been that this doesn't interfere with the Federal laws, because the Federal laws are designed only to deal with meat that is for consumption. And you say with your, with respect to your animals, that's not what it is. But here, as I understand the, the Petitioner's and the government's position, it is that nonambulatory animals can be turned into meat for consumption. So you don't know whether it fits under the definition of the State law until you've violated it. No, because when an animal, animal becomes nonambulatory, it is readily apparent. That's a characteristic that is readily apparent. And in, at least in California, when the animal becomes nonambulatory, the requirement would be to, to immediately euthanize the animal, because it's not  Kagan. Kagan. Kagan. But that's exactly where the California system diverges from the Federal system, because under the Federal system, you separate the animal out and then you take a look at it, and then you decide whether that animal can continue to go through the process and eventually become meat, or whether you euthanize it. So the California system commands an action that the Federal system say may be necessary, but may not be. It commands an action, but it's not within the scope of the Act, because at the very outset, California is saying that these animals are not to be part of the meat supply system in California. So the Federal system has said maybe they should be part of the meat supply system. They may be part of the meat supply system, but it's not required. It's not, the nonambulatory animals. Breyer. But in any case, this is a simple question that occurs. I am an inspector at a Federally inspected meat facility. I look around and there is a cow and it's lying down, all right? It seems to me that your law says I have to go over and see that it is immediately euthanized. Now, how is that not what is forbidden, a requirement, exact words are, in addition to or different from the Federal requirement governing the operations of that Federal meatpacking facility? The Federal law does not require me immediately to go over and euthanize the cow. Your law does require me to go over and immediately euthanize the cow, and therefore, your law seems an additional requirement in respect to the operations of a meatpack, a Federally inspected meatpacking facility. Now, that seems to me the obvious, simple argument that people have been making, and I would like to know your obvious, simple answer. Certainly, Your Honor. The euthanization is an operation of the slaughterhouse, but it's — but this, California's provision is not within the scope. And pursuant to 678, to be expressly preempted, it has to be within the scope and with respect to operations. So with respect to that provision, the euthanization provision, we can see that it is part of the operations, but it is not within the scope because we're dealing with an animal that California has deemed as not part of — as — excuse me. Sotomayor, I understood that the Federal regulation — you can correct me if I'm misunderstanding — is that if there is a suspect animal of any kind, that it requires the slaughterhouse to wait until the Federal inspector comes and finds out whether it's a suspect or it's something that can't be sold. And the reason why the inspection occurs, as I understand it, is that there are some diseases that are so contagious that if the inspector decides that that animal is carrying that disease, that the whole lot will be quarantined or otherwise destroyed. So are you fighting with — that that's what the purpose of pre-inspection under the Federal system is for? The distinction I would make, Your Honor, is that the purpose of the antemortem inspection is to determine if the animals' meat will be wholesome and unadulterated. To the extent that the pre-inspection or the inspection also finds diseases that can be passed on to other animals or to the rest of the herd, that's certainly a benefit, but it's not part of the purpose of the Federal inspection. Sotomayor, I'm having a hard time drawing that distinction. If there is a valid purpose to the pre-mortem inspection, and I can't see how you can argue otherwise, that there may be some diseases that are so contagious that the entire lot, ambulatory or nonambulatory swine or aphrodisiac swine, that are infected, then I don't see how you can argue that you are entrenching on the scope of the statute. Because the scope of the statute is to ensure that meat is unadulterated. And if there is the risk of contagion, that has to be within the scope. Two points. One, the diseases that were referenced by the amicus dealing with this are diseases that will be passed to the animals, not to humans. And the second point is that the purpose, again, of the Act, as specified in 602, is to make sure that the meat of the animal is wholesome and unadulterated. And the anti-mortem inspection will occur for every animal that goes into the meat supply system. So if California withdraws a nonambulatory animal, it doesn't receive the anti-mortem inspection, it's not going into the meat supply system. But all of the other animals in that pin that are ambulatory, pursuant to the Federal law, will receive that anti-mortem inspection and will, by the inspector, the veterinarian, be declared disease-free or not. So they will find they will be able to find those diseases in the ambulatory animals and the ones that are going into the meat supply system. Kagan. So I suppose what you're saying, Ms. Smith, is that California or any State is entitled to take certain categories of animals outside of the whole process, to exclude certain categories of animals from the whole process, and so to exclude them, if you will, from the scope of this chapter. And much as the Seventh Circuit said a State can simply exclude horses from the scope of this statute, you're saying a State can exclude nonambulatory swine from the scope of this statute. But then you have to, you know, ask yourself the question, are nonambulatory swine so easily excludable as horses? Why couldn't the State then exclude swine with various kinds of diseases? And then it would be clear that the State was doing something that the Federal statute is supposed to be doing. Your Honor, if your question is would that be preempted if California excluded nonambulatory swine pursuant to other diseases, it would not be expressly preempted. So California can make decisions on categories of animals, here nonambulatory swine, and the express – it would not be expressly preempted. There may be questions about conflict preemption, but in this particular case, conflict preemption was litigated in the Ninth Circuit, and the Ninth Circuit found that there was no conflict preemption. Scalia, It's an additional requirement. I don't know why it's conflict preemption. It's express preemption. If, indeed, the Federal regulations say that these diseases disqualify the animal from being slaughtered and sold as meat, and California says, no, we think additional diseases should disqualify the slaughter and sale, that's an additional requirement. I don't know how you say that's somehow conflict preemption. It's express preemption. It's not expressly preempted because it's not within the scope. Because California is not putting requirements on animals. Scalia, You keep saying not within the scope. I don't know what you mean by not within the scope. Why is it not within the scope? Because the scope of the Federal Meat Inspection Act does not include every animal on the premises of a slaughterhouse. It's limited by the language of the text of the Federal Meat Inspection Act and the authority given to the Secretary. Scalia, Right, and what limits it? What enables the State to disqualify other diseases that the Federal law does not disqualify? California would say there's no requirement in the text of the Federal Act that specifies that States cannot withdraw animals based on the law. Scalia, It says no additional requirements is what the Act says. Correct. But that is no additional requirements going to animals that are going to become meat.   Both the operations that pertain to those animals that are later sold as meat and the operations that pertain to those animals that are slaughtered and whose carcasses are burned or disposed of. How do you get the limitation to only those animals that are slaughtered for meat? Because it's also within the scope. Within the scope is part of the 678. The express preemption clause references within the scope of the chapter with respect to premises, facilities, and operations. So the scope of the chapter must be considered in terms of what the purpose is, what the language of the text allows the Federal government to do. Roberts, so your argument is that because the Act doesn't speak to whether or not cats and dogs and horses can be sold as meat, you can also say it's not within the scope because it doesn't speak to specifically whether nonambulatory animals can be sold as meat or not. Correct. And since Mr. Chief Justice ---- Well, that seems to me what you're saying, then, with respect to animals that are slaughtered in a slaughterhouse is that the difference is that the State law says you can't sell that as meat, while the Federal law says you can, right? In other words, you're saying, well, just because the Federal law says you can doesn't mean that the State can't say you can't. Correct. Correct. Well, isn't the exact flip side of saying you can sell it is that you can't sell it, is that you can? So when the Federal law says you can, that preempts the rule from the States that says you can't. Well, the Federal law doesn't say you must. It does not say you must sell the meat or you must break the law. We're not talking about conflict preemption. If it said you must and the State says you can't, then there would be conflict preemption. But we're talking about express preemption, which says in so many words no additional requirements. And I don't know how you can get around the fact that this is an additional requirement. Because the no additional requirements has to be qualified within the scope of the Act. But it does. You're right. You're right. I see where you're going. It says we're talking about regulations that are within the scope of the Act. But I have assumed that that means we're not talking about airplanes. We're talking about the subject matter of the Act. And so is this the kind of regulation that is within the subject matter of the Act? And it seems to be. It has to do with how you slaughter animals. It has to be so specific as you say the only things that are within the scope of the Act are the specific requirements that are there already in the Federal Act. Then this prohibition against extra regulations means nothing. I mean, it can't mean that. So it just means it's a subject matter. And now if it means a subject matter, then why don't you lose? Well, even if one looks at the subject matter instead of the scope of the Act, it's a subject matter. What do you mean instead of? What is the scope of the Act? Are you saying the scope of the Act refers only to those particular provisions that are already in the Act? Requirements already there? Yes. The scope of the Act. Yes? Then why do they put in something saying you can't add anything? Because the in addition to is qualified by on the permits with respect to the premises, facilities and operations and within the scope of the Act. But you define the scope almost exclusively by purpose. And regulatory power is broader than purpose. I mean, as is reflected by the regulations here, which are dealing not merely with animals that are adulterated, but are dealing with the whole process of what happens from the minute they arrive to the minute they're sold. So if we don't accept your limitation based on a scope being defined by purpose, how do you win? If one looks at the authority given to the Secretary as well in 621, the authority is specified as dealing with or making sure that no adulterated meat or any carcass, part of carcass meat food product, therefore, is not adulterated. So the focus in 621 on the Secretary's authority is on making sure that the meat is not adulterated. So it's not simply the purpose of the Act of 602, but also the scope of the authority given to the Secretary. Sotomayor, you seem to be assuming that in affecting its obligations that only when it finds adulterated meat is that within the scope. The government has basically said, we've got to figure out if it is, and this is how we're going to do it. We're going to do it starting from the receipt of the swine, through its sale, and we're going to have inspections all through the process, whether or not the meat will ultimately be sold or not. And our scope is what happens in that slaughterhouse. That's the question. So the purpose of the Act is to make sure that the Secretary, as well as the specified purpose of the Act, is focused on not all animals, but animals that will eventually become meat, and making a determination by inspections or examinations whether or not those swine or those meat will be wholesome and not adulterated. Breyer, I didn't see your argument, and now I see it, so I understand where you're going. But then if I look at section 610 of the Act, it has a whole bunch of prohibitions, including prohibitions and references to how you slaughter animals, and including how you slaughter animals humanely. So there, how do you say that this provision, which talks about euthanizing an animal that you look around and it's lying down, how is that not within the scope of the Act? I'm not saying that they have that particular thing, but the subject matter, slaughtering animals, indeed, humanely, is something the Act absolutely deals with. As I mentioned earlier, it's certainly part of the operations. Euthanization is part of the operations. No, I didn't say that. I said, yes, it's part of the operations, but also it's the subject matter with which the Act deals. The Act deals with the humane slaughter of animals and other forms of slaughter of animals. So how is the so I repeat my question. It deals with animals in connection with slaughter and that will be slaughtered. And so to the extent that that, that slaughter is seen as an animal that is going towards the meat supply system, as opposed to one that's condemned and being killed and not. Okay. I see. I don't think that's what within the scope means. The preemption provision here in the statute has two provisions. The first one, which is the one we're talking about, says requirements within the scope of this chapter with respect to premises, facilities and operations, which are in addition to or different than those made under this chapter may not be imposed. That's the first one, okay? Requirements within the scope with respect to premises, facilities. Now, the second preemption provision reads, marking, labeling, packaging or ingredient requirements in addition to or different than those made under this chapter. Now, I read the difference between those two being under number two, it has to be different from something that has been made. Whereas under number one, it just has to be different from anything that could have been made under this chapter. It's within the scope of the chapter. It's within the Secretary's authority to prescribe under this chapter. I think that's what Congress meant by the difference between requirements within the scope and in number two, in addition to or different than those made. And that, to my mind, is a much more plausible explanation of within the scope than, you know, it's directed to the purpose of the statute. I don't think within the scope has anything to do with the purpose. It has to do with whether the Secretary is authorized to act in this field under the chapter. And as I mentioned, the Secretary is given several different points, authority to act under this chapter, and the Secretary's authority is circumscribed to making sure that meat is not adulterated and setting up inspections and examinations. Sotomayor I'm sorry, you're not seriously arguing that the Secretary couldn't regulate in the manner California has, that the Secretary is powerless under this act to say you can't slaughter animals that can't walk. No, the Secretary can't do that. Yes, the Secretary, yes. Because that would be a requirement, is that, is that, do you rely heavily on, on the distinction between a requirement and something that's merely permissive? No, we don't. Our focus is on, on the scope of the act and not on requirements. We, we concede that the California statute is setting out requirements, the requirements in the Penal Code dealing with animal cruelty in, in areas traditionally regulated by the State. So we, we do not dispute that the, the provisions in the State law are requirements. But suppose, Ms. Smith, you decided that the Secretary was not doing a good job in terms of inspecting for disease. So I guess that there's some disease called diamond skin disease which affects a lot of pigs. And you just thought that the inspection standards were far too lenient. And you said, okay, we're not going to allow pigs with diamond skin disease to be slaughtered. Under your theory, you could do that, too, isn't that right? Yes, we could, because we would be categorically withdrawing the animal from, from the process. I want to be clear, though, we're not setting, with this law, we are not setting up in an inspection and examination process. It's, this provision is in the Penal Code, it's an animal, it's within the animal cruelty statutes. It is not an attempt to set up. But it in fact requires a parallel inspection system. It's trying to do the exact same thing that the Secretary is trying to do, which is trying to remove animals with a certain kind of disease. And it requires an inspection system of its own. In our, our case or your hypothetical? In my hypothetical case. In your hypothetical. And then I think that the cases seem similar to me. Well, it's, it would not be expressly preempted, the hypothetical that you have given me, because we're withdrawing these animals from the scope of the Act. There may be questions about conflict preemption in that, in that example. But with respect to what we're doing, what the California provision is doing, there it's not setting up a parallel provision. It's not trying to set up a preemption. The other argument is that it is within the scope of the Act, because it is preeminently something that the Secretary is authorized to regulate, this nefarious diamond skin disease, which we're all familiar with. It's within the scope of the Act because he could act, and indeed is, is told to act, to prevent stuff like that. And that's why it's within the scope of the Act for California to do something in addition to what he has chosen to do. And that's why there's a difference between 1 and 2, requirements within the scope and marketing, labeling and packaging requirements in addition to or different from those made. This one isn't made, but it is within the scope of what the Secretary could make, and therefore, California should butt out. Let me be precise about if one was — if one saw that paragraphs B and C of the California law were within the scope, there's still an argument that they have to be part of the operations, the premises, facilities and operations. And certainly with respect to Requirement A, the buying, selling and the sale of meat, those are not necessarily operations. And we do dispute the factual assertion that's been made that all purchasing happens on the — on the slaughterhouse grounds. There's no factual record of that in the lower record. We have no way to dispute that because it was not litigated. Scalia. Suppose I agree with you on that, but don't agree with you — or at least I'm dubitante on that and disagree with you on the rest. What do I do? We believe the law could be or would be severable. In the Ninth Circuit, the preliminary injunction went to all provisions except for subparagraph E. We would have to litigate severability, of course, but we do think that it would be severable and it seems that the Ninth Circuit's. Roberts. What purpose does the ban on buying and selling have, other than to implement the restrictions that go to operations? Well, the purpose of the California law is twofold. One, general public health, but there's also a very strong component of prohibiting animal cruelty. And so prohibiting the purchase, buying, selling or the sale of meat. That seems to me to be the answer, that no, it doesn't have anything else to do, because the animal cruelty that you're concerned about takes place on the premises as a result of the operations. And so you prohibit the buying and selling of an animal that wasn't treated the way you think it should be treated to give effect to your views on how it should or should not be treated, which seems to be expressly preempted. Well, not necessarily, because the law, if we look at the entire California Penal Code section, it's dealing not just with slaughterhouses. So it is trying to deal with a comprehensive problem that it sees with respect to nonambulatory animals, not just at the slaughterhouse, but at other market agencies, et cetera, at livestock agencies. And so the focus on purchasing, buying, receipt, selling of the meat is to prohibit and stop the commerce in nonambulatory animals. And California's purpose there, as I said, was twofold, to, one, protect general public health, but also to prohibit animal cruelty in an area where California legislators were concerned about the humane treatment of nonambulatory animals, not just swine, because the law is broader than that, but that's what's at issue here today. What does it include besides swine? It includes cattle, sheep, goats, and swine. And the preliminary injunction was brought at the end of that. Those are — those all go through slaughterhouses? They do. They do. Thank you, counsel. Mr. Wells, you have four minutes remaining. Thank you. I just have a couple of quick points to make. One is that the Secretary has interpreted the Section 602 and Section 603 and Section 604 to require that all animals be handled — all animals on the premises be handled humanely and that all animals be subject to the regulations under the chapter. That's set forth in 9 CFR 302.3, and it's also set forth in the Secretary's directives, its Directive 6100 at Appendix 47. So the Secretary does not make a distinction in implementing Section 602 through 604 between animals that the State may choose to try to categorically remove. It applies to all animals, and that is critical, because a State — a slaughterhouse worker who is on the premises needs to have one set of rules that the worker follows so that the worker knows that if he follows the advice of a Federal inspector and, for example, puts a nonambulatory animal, separates the animal, puts it in a covered pen, and lets it go through the antemortem inspection that it's required to have under Federal law, that the slaughterhouse worker won't go to jail. And that's why it's critical that to Congress — that was critical to Congress that we have this uniformity, and I think it's critical that this Court find preemption in this case, because otherwise Federal law will appear and disappear, apparently, based on when the State believes that it's removing animals from in connection with slaughter, whenever that would occur. Just one other point, and that is, it is also crystal clear that the Humane Methods of Slaughter Act of 1978 incorporated the standards of humane treatment that were included in the Humane Methods of Slaughter Act of 1958. And it isn't just the preamble to that public law that indicates that. Those requirements are found now in 21 U.S.C. section 603B, and they are backed up by prohibitions, which are backed up by criminal penalties, in 21 U.S.C. section 610, yes, 610B. And if the Court has no more questions, I'll conclude my remarks. Roberts. Thank you, counsel. The case is submitted.